IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2017 NOV -2 P 1:29

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **CHRISTOPHER MUTTERSBAUGH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: 2:17-cv-746 |
| ) | |
| **HYUNDAI MOTOR** ) | |
| **MANUFACTURING OF** ) | |
| **ALABAMA, LLC,** ) | |
| ) | **JURY DEMAND** |
| **Defendant.** ) | |

## COMPLAINT

### I. INTRODUCTION

1. This is an action alleging disability discrimination in violation of Title I of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. 12101 et. seq., brought by Christopher Muttersbaugh. Plaintiff is a qualified individual with a disability. Plaintiff alleges that Defendant discriminated against him based on his disability, his record of disability, and Defendant's perception of Plaintiff as disabled, in violation of the ADA. Plaintiff seeks injunctive relief, equitable relief, reinstatement, lost wages and benefits, compensatory damages, and reasonable attorney fees and costs.

### II. JURISDICTION

2.  This Court has jurisdiction in accordance with 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391.

3.  Plaintiff has fulfilled all conditions precedent to the institution of this action under Title I of the ADA. Plaintiff timely filed his charge of discrimination within 180 days of the occurrence of the last discriminatory act. On August 4, 2017, after investigating the claim, the Equal Employment Opportunity Commission issued a Right to Sue Notice. Due to an address error, that Notice was re-issued on August 18, 2017. Plaintiff timely filed this lawsuit.

### III. PARTIES

4.  Plaintiff, Christopher Muttersbaugh, is an individual over the age of 19 years and is currently a resident of Waterford, Michigan. During the time period relevant to this lawsuit, Plaintiff was a resident of Millbrook, Elmore County, Alabama. Plaintiff is an individual with a disability, has a history of a disability, and is regarded by Defendant as disabled. Despite this disability, with or without reasonable accommodation, Plaintiff could perform the essential functions of his position. Consequently, Plaintiff is a qualified individual, as defined under the ADA.

5.  Defendant Hyundai Motor Manufacturing of Alabama, LLC, is an "employer" as defined under the ADA and subject to compliance with the ADA. 42 U.S.C. 12111(5). Defendant operates a manufacturing facility in Montgomery, Montgomery

County, Alabama.

## IV. FACTUAL ALLEGATIONS

6. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs above with the same force and effect as if fully set out in specific detail herein below.

7. On May 3, 2010, Defendant hired Muttersbaugh in the position of Warranty Reclaim Specialist at its facility in Montgomery, Alabama.

8. As a Warranty Reclaim Specialist, Muttersbaugh reviewed warranty claims made against Hyundai from dealerships and handled payments or charge backs to Hyundai suppliers. In connection with the engineering department and manufacturing suppliers, Muttersbaugh also analyzed and adjusted ratios for payments of claims for various parts.

9. Muttersbaugh learned the job quickly and performed his job duties well.

10. Muttersbaugh's immediate supervisor was Assistant Manager Jennifer Bayless. Bayless's supervisor was Manager Mark Rylatt.

11. Soon after beginning work, Muttersbaugh informed his management team (Bayless and Rylatt) that he had diabetes. Muttersbaugh was diagnosed with Type I diabetes at the age of 14. Although he is diligent in his diabetes management, Muttersbaugh still experiences low and high blood sugar events whose effects can range from momentary weakness to loss of consciousness.

12. Muttersbaugh's initial performance reviews, completed by Bayless, indicated he was consistently meeting expectations.

13. In August of 2010, Muttersbaugh had an insulin reaction in Defendant's parking lot. A co-worker assisted in calling for medical attention. Muttersbaugh does not have a memory of the time between being in the parking lot and later being in the Hyundai medical office, where a nurse was helping him drink a sugary beverage in order to deal with his insulin event.

14. The next work day, Rylatt told Muttersbaugh that Rylatt had either heard or seen Muttersbaugh "flopping around like a fish out of water" either in the ambulance or on a stretcher. Muttersbaugh was embarrassed by Rylatt's comments and felt they were meant to make fun of Muttersbaugh's disability.

15. Muttersbaugh made a verbal complaint to Human Resources.

16. In early 2011, Rylatt informed the Warranty Reclaim Group that they would be required to perform certain additional duties, including driving and quality evaluations. Often, this involved moving vehicles from one parking lot to another on the Hyundai facility campus and was required during Muttersbaugh's lunch hour.

17. Eating meals on a consistent schedule is important for effective management of Muttersbaugh's diabetes. As a result, Muttersbaugh asked Rylatt if he could break for a quick lunch at a specific time during the day. Rylatt refused to allow

4

Mutterbaugh to eat at a regular time and instead said Muttersbaugh had to move the vehicles whenever Rylatt requested, even if it meant Muttersbaugh missed his regular lunch time.

18. Muttersbaugh then took his request for the reasonable accommodation of a regular lunch period to Human Resources. HR told Muttersbaugh that he was required to follow Rylatt's instructions. HR took no steps to interact further with Muttersbaugh regarding the provision of reasonable accommodations.

19. Missing lunch or eating lunch significantly later than normal caused Muttersbaugh to experience insulin reactions. He would feel sick, making further work during the day difficult. It also increased his stress, which exacerbated other adverse effects of Muttersbaugh's diabetes.

20. Around this time period, Rylatt told Muttersbaugh that Muttersbaugh would need to start using his vacation time for doctor's appointments. Muttersbaugh believed this was contrary to company policy and simply Rylatt's decision, designed to punish Muttersbaugh for taking time off to deal with his disability.

21. Muttersbaugh questioned HR about the issue. Because Muttersbaugh was a salaried employee, he was allowed to use paid leave (referred to as 'salary continuation' and not the same as 'vacation' time) for doctor's visits.

22. Muttersbaugh provided the policy to Rylatt. Rylatt said Muttersbaugh wasn't

allowed to be in possession of that policy and seemed to dispute its accuracy.

23. On February 28, 2011, Muttersbaugh received his end of year performance review. Although the comments continued to demonstrate improvement and success in required objectives, the final numeric scores were lower than previous reviews. Bayless said that she had authored the comments, but Rylatt made the decisions on the numeric scores, lowering the values from Bayless's original review.

24. During the first week of March 2011, Muttersbaugh met with HR to discuss his performance review. Muttersbaugh felt that Rylatt's lowered numeric scores were not descriptive of Muttersbaugh's performance but instead reflective of Rylatt's disdain for Muttersbaugh as a person with a disability who exercised his rights to accommodations and complained when he felt discriminated against based on his disability. HR said maybe Rylatt needed some additional training.

25. Rylatt began subjecting Muttersbaugh to heightened scrutiny.

26. For example, Muttersbaugh's job regularly required him to visit another area of the Hyundai facility and supplier offices located down the street from the Hyundai plant. Rylatt would call over to the other areas to check on Muttersbaugh. Rylatt did not do this for other employees.

27. During Saturday car moves, Rylatt would call one of the other employees to check and see if Muttersbaugh was working. Rylatt did not ask about anyone else.

6

28. In mid-March 2011, Muttersbaugh had an insulin reaction and left his desk for about twenty minutes to obtain a beverage and snack with sugar to alleviate his symptoms. When he returned, Rylatt was upset, telling Muttersbaugh that he had a task he needed completed and Muttersbaugh was inexplicably gone. Muttersbaugh explained the situation and asked what the task was. Rylatt said he found someone else to handle it.

29. In September and October 2011, Muttersbaugh again went to HR. Rylatt was still forcing Muttersbaugh to skip lunch, which was adversely effecting his diabetes management. Again, Muttersbaugh was told that he had to follow Rylatt's instructions regarding work.

30. Rylatt continued to retaliate and discriminate against Muttersbaugh.

31. For example, in October of 2011, a work trip was scheduled for December to meet with various suppliers in Michigan. As he had in the past, Muttersbaugh sought permission to take a few extra vacation days after the work trip. Such requests were routinely granted, assuming no extra travel costs for the company. Bayless approved Muttersbaugh's travel plans and vacation request.

32. Rylatt approved Muttersbaugh's vacation time request, but then informed Muttersbaugh that he was cancelling the business trip. He gave no reason.

33. Muttersbaugh explained that the business trip was necessary to meet his goals

related to the suppliers' burden ratio. Failure to meet these goals could negatively impact Muttersbaugh's performance review. Rylatt said it wasn't his problem. He told Muttersbaugh to just accept the supplier's demand, even though this was not the procedure Hyundai wanted its reclaim review personnel to follow.

34. Muttersbaugh went to HR to discuss the situation. HR told him that Rylatt had asked if he could discipline Muttersbaugh for attempting to tie vacation time in with a business trip. HR said that employees were allowed to do that and did, as long as costs were approved. HR said Rylatt was informed that if he didn't like it, he could just cancel the trip.

35. Later in October 2011, HR representative Amanda Bertagnolli met with Muttersbaugh. She said that Muttersbaugh had been accused of being racist towards Koreans. Muttersbaugh denied the accusation. Bertagnolli said an investigation would be completed and Muttersbaugh could be terminated if the accusations were true.

36. Next Bertagnolli said that Rylatt had accused Muttersbaugh of swearing too much. Again, Muttersbaugh denied the accusation. Further, other similarly situated Hyundai employees frequently used swear words while at work, but were not disciplined or threatened with discipline.

37. On October 28, 2011, Bayless told Muttersbaugh that he should apply for

FMLA. She was concerned that Rylatt was actively looking for reasons to discipline Muttersbaugh.

38. In November of 2011, there was a recall on Muttersbaugh's car, which was a Hyundai.

39. On or about November 14, 2011, Bayless approved Muttersbaugh's request to take his car in for a morning appointment and come in as soon as the repair was complete.

40. The repair took longer than expected, but Muttersbaugh called Bayless and she approved his coming to work late. Muttersbaugh arrived at work approximately two hours after his usual start time.

41. That day after lunch, Rylatt met with Bayless and Muttersbaugh to discuss Muttersbaugh's "attendance issue" that morning. Bayless confirmed Muttersbaugh's account of the events.

42. A day or two after that, Rylatt asked Muttersbaugh to meet with him and Bertagnolli. Rylatt said the meeting was about Muttersbaugh's attendance problem. Bertagnolli said they were going to give Mutersbaugh an official Phase One write up.

43. Rylatt said the discipline was based on Muttersbaugh being late after the recall repair on his car. Rylatt claimed Bayless had not given Muttersbaugh permission to be late. Muttersbaugh disputed this and asked for Bayless to be a part of the meeting.

9

44. Muttersbaugh left the meeting and asked Bayless to speak with Rylatt and Bertagnolli. Bayless explained the situation and Muttersbaugh did not receive a write up.

45. On or about November 22, 2011, Muttersbaugh met with HR Director Sheron Rose.

46. He stated that he thought Rylatt was trying to get him fired because of his diabetes. Muttersbaugh told Rose about jokes and derogatory comments Rylatt made about his diabetes and use of FMLA time. He explained his requests for accommodations and Rylatt's continued refusal. Muttersbaugh also detailed multiple instances where he felt Rylatt had reported false information about Muttersbaugh in order to get Muttersbaugh disciplined or at least investigated.

47. Rose said she would speak with Chris Susock, Director of Quality, and that Susock would meet with Muttersbaugh after an in-depth analysis of the situation.

48. The next day, Rylatt asked Muttersbaugh why he had punched out so late. Muttersbaugh said he had a meeting with HR. Rylatt became upset and asked what the meeting was about. Muttersbaugh said it was private. Rylatt said he wasn't going to pay Muttersbaugh overtime for the meeting.

49. At some point towards the end of the year, Muttersbaugh asked Rob Clevenger, Manager of HR, about the status of the investigation into the accusations of racism

against Muttersbaugh.

50. Clevenger stated that Muttersbaugh was not racist and the investigation was closed.

51. In December 2011, Muttersbaugh was approved for intermittent leave under the FMLA related to his diabetes, retroactive to November 8, 2011 and moving forward.

52. When Muttersbaugh needed to use FMLA, he notified the appropriate persons and his requests were granted.

53. Rylatt did not like that Muttersbaugh took time off work for his disability.

54. In early 2012, Muttersbaugh was copied on an email from Jamie Spalding, an employee in Hyundai's medical department, to Rylatt. In the email, Spalding stated that Muttersbaugh had been approved for FMLA and his FMLA absences were excused. Spalding told Rylatt that Rylatt could not change Muttersbaugh's time card to show that the absences were unexcused.

55. On February 1, 2012, Rylatt met with Muttersbaugh to discuss Rylatt's decision to transfer some suppliers from Muttersbaugh's oversight to a different Warranty Reclaim Specialist.

56. On February 3, 2012, Rylatt forced Muttersbaugh, again, to skip lunch at his regular time. Although, in response to Muttersbaugh's repeated requests, Rylatt later

11

gave Muttersbaugh permission to get something to eat, he did not give Muttersbaugh sufficient time to eat before requiring that he return to work. As a result, Muttersbaugh experienced an insulin reaction. No one from management or HR discussed this incident with Muttersbaugh.

57. On February 20, 2012, Bayless told Muttersbaugh that Rylatt made her change both comments and point values on Muttersbaugh's year end performance review.

58. On February 27, 2012, Muttersbaugh met with Rylatt to go over the performance review. Again, Muttersbaugh felt that Rylatt's assessment of his performance was inaccurate. Rylatt said that Muttersbaugh would be placed on a Personal Improvement Plan.

60. Because Muttersbaugh's numerical scores were so low, Muttersbaugh did not receive the annual pay raise.

61. In the Spring of 2012, Christina Blue moved from the factory/assembly portion of the plant to the administrative side and became a Reclaim Warranty Specialist.

62. Rylatt allowed Blue to leave early one day a week to accommodate her school schedule. Although Muttersbaugh was also in school, Rylatt never allowed him to leave early.

63. On May 16, 2012, TheRessa James, Assistant Manager in the Quality Evaluation group, was waiting to meet with Chris Susock when she heard Rylatt

talking with Susock. Rylatt was complaining about Muttersbaugh taking so many days of FMLA for his diabetes. Rylatt said Muttersbaugh should be able to get his blood sugar in order and not take the entire day off. Rylatt said he was going back to HR to see what could be done. James felt Rylatt's comments were inappropriate.

64. James reported her concerns via email to Robert Clevenger in HR that same day.

65. Rylatt's discriminatory and retaliatory conduct towards Muttersbaugh continued. Muttersbaugh looked for other open positions in the company in order to get away from Rylatt's supervision.

66. In December of 2012, Muttersbaugh sought and received confirmation from HR that he was eligible for a job transfer or promotion.

67. He interviewed for a position in a new department, but was not ultimately chosen. On information and belief, Rylatt and Susock told the individual in charge of hiring not to choose Muttersbaugh.

68. On January 29, 2013, Muttersbaugh had a casual conversation with co-workers Blue and Richard Lichtenberger at the end of a the work day. Conversation topics included Blue's anger at having been chosen again for a 'random' drug test, HR members not having to follow company team wear rules, security checks at the Hyundai entrance, and recent news events such as the Sandy Hook shooting. The

three told each other good evening and left.

69. On January 30, Muttersbaugh had an insulin reaction and used FMLA leave for that day.

70. On January 31, a security vehicle met Muttersbaugh in the parking lot. Officers escorted Muttersbaugh to the security office. About 30 minutes later, Rylatt and HR representatives met with Muttersbaugh. They accused Muttersbaugh of threatening to plant explosives at Hyundai. Muttersbaugh denied the accusation. They told Muttersbaugh he was being suspended without pay.

71. Muttersbaugh then left the facility. This brief conversation was the only time anyone questioned Muttersbaugh about theses alleged threats.

72. Muttersbaugh called HR for updates each day for a week following his suspension. Finally, Clevenger returned his call and told Muttersbaugh he was fired.

73. On February 6, 2013, HR sent a letter to Muttersbaugh informing him of the alleged reasons for termination. In addition to the allegation of a comment "about potentially placing an explosive device at" Hyundai, the letter states that, on January 29, Muttersbaugh made "profane and hateful comments regarding other Team Members in a threatening and aggressive manner."

74. The allegation about profane and hateful comments was not discussed with Muttersbaugh on January 31 or at any other time prior to his termination.

14

75. Muttersbaugh denies making threats and denies making profane and hateful comments in an aggressive or threatening manner. Such allegations were a pretext for discrimination.

76. On information and belief, a committee was formed to determine if a Team Member Review Board should be held to review Muttersbaugh's termination. Contrary to company policy, Rylatt was a member of that review committee.

77. Defendant intentionally discriminated against Plaintiff based on his disability, by failing to reasonably accommodate him and by terminating his employment, in violation of the Americans with Disabilities Act, as amended.

78. Defendant's actions against Plaintiff were in retaliation for Plaintiff seeking an accommodation for his disability to which he was entitled and for raising his rights under the Americans with Disabilities Act.

79. Plaintiff is an individual living with a disability but is able to perform the essential functions of the job of Warranty Reclaim Specialist or other positions, with or without accommodation.

80. Plaintiff's condition substantially limits major life activities, including but not limited to, the functioning of his endocrine system.

81. Plaintiff has a history and record of disability, which was known by Defendant.

82. In denying the Plaintiff employment and/or reasonable accommodations related

thereto, Defendant intentionally, willfully, and maliciously discriminated against Plaintiff on the basis of his disability, in complete disregard for his federally protected rights.

83. As a result of Defendant's actions, Plaintiff has suffered extreme harm, including, but not limited to, loss of employment opportunities, denial of wages, compensation, and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including pain, humiliation, emotional distress, mental anguish and suffering, and loss of enjoyment of life.

## V.   CAUSES OF ACTION

84. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs above with the same force and effect as if fully set out in specific detail herein below.

85. Plaintiff is a person with a disability, as that term is defined by the Americans with Disabilities Act. See 42 U.S.C. 12102.

86. Defendant is a covered entity and an employer in accordance with 42 U.S.C. 12111(5).

87. Plaintiff is a qualified individual as defined under the ADA. Despite Plaintiff's disability, with or without reasonable accommodation, he is able to perform the essential functions of the job of Warranty Reclaim Specialist and other positions. See 42 U.S.C. 12111.

88. Under the ADA, Defendant is prohibited from discriminating against Plaintiff, a qualified individual, on the basis of disability in regard to, *inter alia*, advancement, discharge, employee compensation, and other terms, conditions, and privileges of employment. 42 U.S.C. 12112(a).

89. The ADA's protection against discrimination also prohibits utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability. 42 U.S.C. 12112(b)(3)(A).

90. Defendant violated the ADA by failing to provide Plaintiff with reasonable accommodations. 42 U.S.C. 12112(b)(5)(A).

91. Defendant refused to engage in the interactive process in response to Plaintiff's requests for accommodations. Such accommodations would not have imposed an undue hardship on the operation of the Defendant's business.

92. Following Plaintiff's protected activities of requesting accommodations and making internal complaints about Defendant's earlier failure to provide such accommodations and his supervisor's discriminatory conduct, Defendant retaliated and discriminated against Plaintiff, including by giving him lower scores on evaluations and restricting his employee benefits.

93. In terminating the Plaintiff, Defendant has maliciously, intentionally, and with reckless disregard discriminated against Plaintiff due to his disability. See 42 U.S.C.

12112.

94. Defendant's actions against Plaintiff, including termination, were in retaliation for Plaintiff seeking an accommodation for his disability to which he was entitled and for raising his rights under the Americans with Disabilities Act. 42 U.S.C. 12203.

95. Defendant has no legitimate, non-discriminatory reason is for its conduct.

96. As a proximate result, Plaintiff has suffered extreme harm including, but not limited to, loss of employment, denial of wages, compensation, and other benefits and conditions of employment. Plaintiff has also suffered injury, including pain, humiliation, mental anguish and suffering.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1. Issue a declaratory judgment that the employment practices, policies, procedures, conditions, and customs that led to the discrimination by Defendant violate Plaintiff's rights as secured by the Americans with Disabilities Act, 42 U.S.C. 12101, et seq. ("ADA").

2. Grant Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request, from continuing to violate the ADA.

3.  Enter an Order requiring the Defendant to make Plaintiff whole by awarding Plaintiff reinstatement, back-pay (plus interest), lost benefits, and compensatory, punitive, and nominal damages.

4.  Plaintiff further prays for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses incurred by this litigation.

5.  Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this suit, and this action for injunctive, declaratory and other relief is his only means of securing adequate relief.

Respectfully submitted,

*Rachel M.*

Rachel L. McGinley
Alabama State Bar Number: 1892-A64M
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

**PLAINTIFF HEREBY DEMANDS TRIAL BY STRUCK JURY.**

Plaintiff requests this Honorable Court to serve via certified mail upon the Defendant the following: Summons, Complaint.

**Defendant's Registered Agent**
Christopher Smith
700 Hyundai Blvd
Montgomery, AL 36105

_Rachel M_____
OF COUNSEL