**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER MUTTERSBAUGH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-746-MHT-DAB** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **OF ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

In this termination lawsuit brought pursuant to Title I of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. 12101 *et seq.*, Plaintiff Christopher Muttersbaugh alleges he was discriminated and retaliated against in violation of the ADA by his former employer Hyundai Motor Manufacturing of Alabama, LLC ("HMMA"). Pending before the court is Defendant HMMA's Motion for Summary Judgment. (Doc. 25). The parties have had an opportunity to fully brief the matter. For the reasons that follow, it is recommended that Defendant's Motion for Summary Judgment (Doc. 25) be **granted**.

**I.      JURISDICTION**

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds sufficient information of record to support both. *See* 28 U.S.C. § 1391. On January 5, 2018, the above-styled matter was referred to the undersigned for review by United States District Judge Myron H. Thompson. (Doc. 15); *see also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

**II.      LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1263 (quoting *Anderson*, 477 U.S. at 251–52).

## III.    BACKGROUND FACTS[1]

---

[1] Unless otherwise indicated, the background facts are taken from Plaintiff's statement of facts in his brief in response to the motion for summary judgment. (Doc. 32).

In a light most favorable to the Plaintiff, the undisputed facts are as follows. On May 3, 2010, Defendant hired Muttersbaugh in the position of Warranty Reclaim Specialist at its facility in Montgomery, Alabama.[2] His responsibilities included reviewing warranty claims made against Hyundai from dealerships, handling payments or charge backs to Hyundai suppliers, and analyzing and adjusting ratios for payments of claims for various parts. Muttersbaugh learned his job quickly and performed well.  His immediate supervisor was assistant manager Jennifer Bayless with whom he interacted daily and got along. Bayless' supervisor was manager Mark Rylatt, and Rylatt's supervisor was Director Chris Susock.  Muttersbaugh's desk was located in a cubicle on the second floor of the administration building surrounded by cubicles used by co-workers, supervisors, and employees from other departments.  The open office environment of the second floor allowed co-workers to overhear each other's conversations.

Soon after beginning work for Defendant, Muttersbaugh informed Bayless and Rylatt he had diabetes.  Due to his Type I diabetes, he needed to monitor his blood sugar levels on a regular basis.  Accordingly, he requested from his management team reasonable accommodations, including being allowed to eat meals and snacks on a routine basis, working consistent work hours, and taking time off for diabetes-related doctors' appointments.  If requested, Muttersbaugh provided medical documentation regarding his diabetes-related accommodations requests.  Rylatt had the authority to approve such requests. Plaintiff admitted that he could have and regularly did purchase food from the vending machines and cafeteria during the day throughout his employment. (Doc. 27-4 at 36:3–23, 64:16–20; 100:11–22).   It is undisputed that Plaintiff could always access the vending machine area during his employment at HMMA. *Id.* at 37:16–20.

---

[2] HMMA generally refers to its employees as "Team Members" or "TMs." (Doc. 26, ¶ 2).

Beginning in 2010, Rylatt would interrupt Muttersbaugh while he was eating a snack. Plaintiff claims this denied him his reasonable accommodation because he would have to delay eating to answer a question or edit a report for Rylatt. Rylatt made negative remarks about Muttersbaugh when he would be away from his desk or out due to his diabetes. When Muttersbaugh would be away from his desk to eat a snack, Rylatt would attempt to get him in trouble with Bayless questioning whether Muttersbaugh had completed a task. Rylatt admits he has asked employees to delay lunch to complete a task.

In August 2010 Muttersbaugh suffered a severe insulin reaction at work that required medical attention. According to Muttersbaugh, Rylatt made fun of him at work the next day stating he had seen Muttersbaugh "flopping around like a fish out of water." Muttersbaugh was embarrassed by Rylatt's comments mocking his disability. Rylatt denies making the comment.

In October 2010 Rylatt gave Bayless a discussion planner[3] in connection with an incident involving Muttersbaugh. As a result, Bayless felt pressured to discipline Muttersbaugh even though she did not agree with it just because Rylatt recommended it. Bayless complained to management multiple times about Rylatt, but never saw him receive discipline because of it.

In early 2011, Rylatt told Muttersbaugh he would need to use vacation time for diabetes-related doctors' appointments. Muttersbaugh complained to human relations about this. Muttersbaugh was thereafter allowed to use salary continuation which did not use up personal or vacation time.

During this same time frame, the working hours for Muttersbaugh and other employees were changed to begin at 6:30 a.m., instead of 8:00 a.m. This change in schedule adversely

---

[3] Defendant has a progressive corrective action process that includes discussion planners, which are non-disciplinary in nature, and four levels of Corrective Action "Phases." (Doc. 26, ¶ 8).

effected Muttersbaugh's diabetes management.  His request to remain on his original schedule was denied by Rylatt.

In February 2011, Muttersbaugh received his year-end review for 2010.  Although the comments, which were authored by Bayless, were positive and continued to show improvement, the numeric score was lower than prior reviews.  Rylatt was the one assigning the numeric score. Muttersbaugh complained to human resources about the lower scores received from Rylatt. Human resources suggested Rylatt needed additional training, but there was no follow up.

In the spring of 2011, Rylatt required Muttersbaugh and others to move cars on Saturdays and during the workweek.  Rylatt would not allow Muttersbaugh to delay his car-moving duties even if it conflicted with his accommodation of needing to eat a meal or snack at a particular time.

Muttersbaugh cites to numerous incidents in which he contends Rylatt was trying to get him fired.  In August 2011 Rylatt complained to team relations about Muttersbaugh having a problem with a Korean employee.  An investigation was conducted and Muttersbaugh was warned that this type of discrimination allegation could get him terminated.[4]

In November 2011 Bayless gave Muttersbaugh a discussion planner regarding work conduct.  The discussion planner indicated that the investigation regarding his conduct determined it was not a violation.  Bayless told him at that time that Rylatt was looking for ways to get rid of him.  She suggested Muttersbaugh apply for FMLA leave to protect his diabetes-related absences.

---

[4] The HMMA Handbook provides that "Serious Misconduct Offenses" are those which are so serious that it would not be appropriate to address them through discussion planners or within the phased Corrective Action Process. Serious Misconduct Offenses include discrimination, workplace violence, and serious or excessive violation of Defendant's performance standards. If an employee is found to have committed a Serious Misconduct Offense, he or she may be terminated or may receive a letter of conditional employment. (Doc. 26, ¶ 9).

Muttersbaugh complained to team relations that Rylatt was treating him differently because of his diabetes, but according to Muttersbaugh, Defendant did nothing about it.

On November 14, 2011 Rylatt gave Muttersbaugh a discussion planner for work conduct and failing to follow his instructions about how to report. The next day, Muttersbaugh had permission from Bayless to be late to work because of a delayed car repair.  Rylatt was going to give him a phase one write up for being late, but then he agreed not to after talking to Bayless.  On November 22, 2011, Muttersbaugh met with team relations to complain about Rylatt's discrimination of him due to his diabetes.  He relayed instances of derogatory comments and jokes made by Rylatt about Muttersbaugh's diabetes and his use of FMLA time.  Muttersbaugh complained that Rylatt continued to refuse his repeated requests for accommodations and reported false information about him to get him in trouble.  He was assured that Director of Quality, Chris Susock, would be informed.  On November 29, 2011, team relations followed up with Muttersbaugh regarding his November 11 complaint and they determined there was no evidence of discrimination or retaliation.  There was never follow up by team relations about Muttersbaugh's November 22 complaints.

In December 2011 Muttersbaugh was approved for intermittent FMLA leave. Bayless testified that Rylatt's treatment of Muttersbaugh became worse after this. In early 2012 Muttersbaugh was copied on an email from the medical department stating his FMLA absences were excused and Rylatt could not change his time cards to show them to be unexcused. On February 10, Muttersbaugh requested a break to eat lunch, but Rylatt refused and Muttersbaugh continued to work. As a result, he suffered an insulin reaction. Rylatt wanted to discipline Muttersbaugh for his performance on this date. He was not disciplined.

On February 12, 2012, Muttersbaugh received his annual review from Rylatt who stated he needed improvement.  This sub-standard rating resulted in Muttersbaugh not receiving an annual raise.  Bayless was not involved in the annual review which was contrary to typical practice, and the numeric evaluation she had recommended had been lowered by Rylatt.  Muttersbaugh disagreed with the review and wrote in the comments that he thought it was harassment.  Shortly thereafter, Muttersbaugh received a discussion planner for an error in reclaim which he denies was his fault.

In the spring of 2012, Christina Blue became a warranty claim specialist working in the same department with Muttersbaugh.  While they were able to work together, they had different personalities and sometimes verbal disagreements.  Muttersbaugh claims Rylatt treated Blue, a non-diabetic employee, better.  He would accommodate her requests to leave early due to her school schedule, but deny Muttersbaugh's requests.

In May 2012, an assistant manager in the Quality Evaluation Group purportedly overheard Rylatt complaining about Muttersbaugh taking so many days of FMLA leave due to his diabetes. The assistant manager complained about this, but Rylatt was never disciplined for his comments.

In June 2012, Rylatt found Muttersbaugh tardy for going over his break and lunch time. When Muttersbaugh was away from his desk, Rylatt would call around the plant checking up on him.

In December 2012 Muttersbaugh interviewed for a position in a different department in an effort to get away from Rylatt's supervision and discriminatory conduct. Muttersbaugh testified that Susock and Rylatt told the individual in charge not to hire Muttersbaugh and he consequently did not receive the position.  Also in December 2012, Muttersbaugh and Blue both requested to leave early, but Rylatt only approved Blue's request, not Muttersbaugh's.

On January 29, 2013, Muttersbaugh had a conversation with his co-workers. The exact details of the conversation are in dispute, but Muttersbaugh acknowledges that he made a statement that he was not a fan of Amanda and that the Amanda thing irritated him.[5]  He acknowledges they were generally discussing security at the facility and he mentioned that someone could bring a bomb into the facility in a backpack because security doesn't check backpacks.  He denies saying that if he had a disagreement with someone, he wouldn't come shoot them, but rather would plant a bomb and detonate it with a phone call. He testified that the discussion was in the context of shootings and he didn't understand why people did that.  (Doc. 27-4 at 186–91).

On January 30, Muttersbaugh called in to say he was taking an FMLA day because he had a diabetic episode the prior night.  On that day, Blue reported to Bayless her concerns about her January 29 conversation with Muttersbaugh.[6]  Blue relayed that she was engaged in a conversation with Quality Assurance employees, Chris Davis and Richard Lichtenberger, about random drug testing at HMMA and someone asked what employee comes to escort team members to a random screening.  Someone answered that it would likely be Amanda Bertagnolli.  Muttersbaugh was standing nearby and interjected himself into their conversation.  After using profane language in a reference to Ms. Bertagnolli, Muttersbaugh proceeded to go on a rant about how everyone who worked on the third floor didn't deserve to breathe.  Blue was scared by Muttersbaugh's comments and told him that in light of recent shootings that he should not be saying such things. According to Blue, Muttersbaugh responded, he "wouldn't come in to shoot someone [he] had a disagreement against, [he] would just plant a bomb and tie it to the phone and call in to detonate." *See* Doc. 27-

---

[5] Human Relations Specialist Amanda Bertagnolli was the individual that conducted the investigation of Muttersbaugh regarding a discrimination claim against him.

[6] Blue was uncomfortable and concerned by Muttersbaugh's comments, but became even more concerned when his car was not at work the next morning. (Doc. 27-11 at 2).

10. In addition to speaking to Blue, Bayless also interviewed Lichtenberger who corroborated Blue's report of the incident and Muttersbaugh's comments. *Id.* at 2.

Muttersbaugh states the police were not called and the building was not put on lock down. According to Muttersbaugh, Rylatt knew complaints of workforce violence could be grounds for termination.

Defendant's employee handbook has a Workplace Threats & Violence Policy that prohibits workplace violence, threats of violence, and threatening behavior. (Doc. 27-9 at 2). The policy applies to any Team Member that makes substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property.[7] *Id.* The policy states:

> In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to the following: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Members terminated pursuant to the violations of this policy shall not be subject to the Team Member Review Board process.

*Id.*

Team Relations manager Robert Clevenger determines whether conduct is classified as workplace violence or something else. In this case, Clevenger, along with an assistant manager, determined it was a workplace violence situation and initiated an investigation during which Blue, Davis, Lichtenberger, Rylatt, and Muttersbaugh were interviewed. *See* Doc. 27-12. Bayless was not interviewed. On February 1, 2013, the workplace violence committee met to discuss Muttersbaugh's case. Kelly Rucker was the head of the committee, but he relied on Team Relations

---

[7] Plaintiff received a Team Member Handbook from HMMA when he began his employment. (Doc. 27-4 at 26:12–19).

to conduct a thorough investigation. Muttersbaugh was fired by letter from Rucker dated February 6, 2013, for violating the Workplace Threats & Violence Policy. *See* Doc. 27-16.

Muttersbaugh contacted the EEOC and completed a Charge of Discrimination which he believed to be summary in nature compared to all the details provided to the EEOC in his discussions. (Doc. 27-27). The Charge, which is date-stamped as received by the EEOC on June 6, 2013, alleges the discrimination took place between June 2013 and February 2013.[8] *Id.*

Defendant produced a document showing nearly 50 terminations from 2012 through 2016 for Workplace Violence Policy violations. (Doc. 27-17).

## IV.   ANALYSIS

### A. *Failure to Accommodate*

To bring a claim for discrimination under the ADA, a plaintiff must first exhaust his administrative remedies, which begins with the filing of a charge of discrimination with the EEOC. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). In a non-deferral state, such as Alabama, a plaintiff must file an employment discrimination charge with the EEOC within 180 days after the date of the alleged discrimination. 29 C.F.R. § 1626.7(a), *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1241 n. 2, 1220 (11th Cir. 2001). If a plaintiff fails to file a timely charge with the EEOC, the result is his claims are barred. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000). Defendant submits that Muttersbaugh's failure to accommodate claims are untimely; the court agrees.

---

[8] The Charge of Discrimination references June 2013 as the earliest date of the discrimination and February 2013 as the latest date. (Doc. 27-27). At the deposition of Muttersbaugh, defense counsel asked if these dates should be flipped with June 2013 being the latest date of the discrimination. Plaintiff did not agree stating the discrimination started when he was hired. The Charge, however, does not indicate a "continuing violation." Because Plaintiff was terminated in February 2013, it makes sense that February 2013 was the last date of discrimination. It is possible the earliest date was intended to be listed as June 2012, not 2013.

Here, Muttersbaugh filed his Charge on June 6, 2013, and thus any incidents occurring prior to December 8, 2012 are time-barred.  *See* 29 C.F.R. § 1626.7.  In the Charge, his deposition, and his interrogatory responses, Plaintiff specifically raises three instances of Defendant's failure to accommodate, *i.e.* regular lunch breaks,[9] disability-related absences,[10] and schedule change.[11] (Doc. 27-18 at 10–11; 27-27 at 2; 27-4 at 75:9–23, 166:2–16, 167:13–168:5, 170:5–171:5). Because these incidents occurred prior to December 2012, they are time-barred, and the motion for summary judgment is due to be granted on this issue.

The court further finds that Muttersbaugh's contention that there has been a continuing violation with respect to claims of failure to accommodate so as to make his earlier issues timely similarly fails. The items he points to are discrete and severable events, and there has been no showing of a continuing violation.

Even if not time-barred, however, his failure to accommodate claims cannot survive summary judgment. To establish a failure to accommodate claim, Plaintiff must show he (1) was disabled as defined by the ADA; (2) was a qualified individual who could perform the essential functions of the position, with or without reasonable accommodation; and (3) was discriminated against because of his disability.  *See Santacrose v. CSX Transp., Inc.*, 288 F. App'x 655, 657 (11th Cir. 2008).  "With regard to the third prong, a qualified individual is discriminated against when his employer fails to reasonably accommodate his disability." *Id.* (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1236 (11th Cir. 2005)).  An employer must reasonably

---

[9] Plaintiff alleges that his regular meal time was interrupted with additional work duties beginning in early 2011. In his Complaint, he identifies other specific dates his work duties necessitated him skipping or delaying his lunch break, the latest of which was February 3, 2012.

[10] Plaintiff alleges that Rylatt tried to make him use vacation time for his disability-related absences in early 2011 and tried to prevent him from using FMLA leave for his absences in and around November 2011 to early 2012.

[11] The work schedule changed in early 2011.

accommodate an otherwise qualified employee with a known disability unless the accommodation would impose an undue hardship in the operation of the business. *See* 42 U.S.C. 12112(b)(5)(A). "[U]nder the ADA a qualified individual with a disability is not entitled to the accommodation of [his] choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1286 (11th Cir. 1997) (citation and internal quotations omitted). The facts here do not support that Defendant failed to reasonably accommodate Muttersbaugh. Despite his complaint he was not given a "regular" lunch break, Muttersbaugh could take his lunch either before or after his driving duties were completed. He was able to and often did eat snacks at his desk throughout the day. He passed vending machines and the cafeteria multiple times per day when he would take a smoke break.[12] Nothing prevented him from eating snacks throughout the day except the window of time when he had to help move cars. And although the schedule changed to a 6:30 a.m. start time, he was able to transition and make adjustments as to when he would eat breakfast and take his insulin. (Doc. 27-4 at 76). Allowing Muttersbaugh to eat at his desk and have snacks throughout the day as necessary addressed his concern with the schedule change and was a reasonable accommodation. Moreover, there is no evidence the schedule change was made because of his disability. Additionally, it was changed for several workers in his department, not just Plaintiff. With regard to his disability-related absences, he admits in deposition and interrogatory responses that he was never denied FMLA leave. (Doc. 27-4 at 170:1–171:16; 27-18 at 11). Thus, the Magistrate Judge recommends Defendant's motion for summary judgment on Muttersbaugh's claims of a failure to accommodate be granted.

B.    *Termination Discrimination Claim*

---

[12] Muttersbaugh testified he took as many as one smoke break every hour. He could eat while on his smoke breaks or go to the cafeteria or vending machines after his smoke break. (Doc. 27-4 at 98–100).

Muttersbaugh asserts he was discriminated against in violation of the ADA when he was terminated.  In order to establish a *prima facie* case of discrimination under the ADA and survive summary judgment, Muttersbaugh must demonstrate that: (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability.  *Gordon v. E.L. Hamm & Assoc., Inc*., 100 F.3d 907, 910 (11th Cir. 1996).  He must also demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled.  *Id.* at 910–11.  A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of an individual; or being regarded as having such impairment.  42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2).  Muttersbaugh claims he suffers from a disability, within the meaning of the ADA, because his Type I diabetes can cause him to experience low and high blood sugar events whose effects can range from momentary weakness to loss of consciousness.  In its motion, Defendant does not challenge whether Muttersbaugh has a disability or is a qualified individual under the ADA.  Accordingly, in a light favorable to Plaintiff, Muttersbaugh is assumed to have met the first two prongs of a *prima facie* case.

Defendant argues Muttersbaugh's claim fails because he is unable to demonstrate causation, *i.e*., that he was terminated because of his disability.  "One way of proving that the

discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (citing *Llampallas v. Mini–Circuits, Lab, Inc*., 163 F.3d 1236, 1249 (11th Cir. 1998)).  Muttersbaugh submits he can establish a *prima facie* case relying upon the cat's paw theory. Specifically, he contends that Rylatt who harbored discriminatory animus against Muttersbaugh was instrumental in convincing Rucker to terminate Muttersbaugh.  He fails to put forth the evidence, however, of Rylatt's discriminatory animus other than speculation and Bayless' hearsay statements. Significantly, he fails to demonstrate even if Rylatt harbored discriminatory animus toward him that it was due to Muttersbaugh's diabetes. There is also no showing that Rylatt made a termination recommendation to Rucker, or that Rucker considered the biased recommendation rather than Muttersbaugh's own conduct as the reason for the termination.  Accordingly, because the record does not support a showing that Muttersbaugh was terminated because of his diabetes, he is unable to establish a *prima facie* case of discrimination.

Even if Muttersbaugh could establish a *prima facie* case of discrimination regarding his termination, his claim still fails because he cannot refute Defendant's legitimate, non-discriminatory reason for his termination with pretext evidence. Defendant terminated Muttersbaugh for violating its Workplace Threats & Violence Policy after multiple employees reported Muttersbaugh made threatening and inappropriate comments about other employees. This is a legitimate, non-discriminatory reason for termination.  To refute this reason with pretext,

Plaintiff must show "both that the reason was false and that discrimination was the real reason" for his termination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512 n.4 (1993). The court finds no substantial showing of pretext in the record and therefore recommends Defendant's motion for summary judgment be granted on Plaintiff's claim of ADA discrimination.

C.    *Retaliation*

The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation, Plaintiff must show (1) he engaged in a statutorily protected activity; (2) HMMA subjected him to an adverse employment action; and (3) the adverse action was causally related to his statutorily protected activity. *See Little v. United Techs., Carrier Transicold Div*., 103 F.3d 956, 959 (11th Cir. 1997). Similar to his discrimination claim, Plaintiff's retaliatory termination claim will also fail. Muttersbaugh is unable to show there is a causal connection between his protected activity and his termination. *See Stewart*, 117 F.3d at 1287 (a plaintiff must show there was a statutorily protected express; an adverse employment action; and a causal link between the protected expression and adverse action).

Muttersbaugh alleges that HMMA retaliated against him after he requested accommodations for his disability and complained about Rylatt in various ways including issuing him negative performance evaluations; Rylatt subjecting him to heightened scrutiny and another TM to complete a task when he could not find Plaintiff; Rylatt canceling a business trip; Team Relations receiving a complaint against Plaintiff regarding racist comments and using too many swear words; Rylatt unsuccessfully issuing him discipline regarding absences; Rylatt permitting another TM to leave early; and Rylatt making a remark about his absences. As noted by Defendant,

these claims are not only time-barred, but also lack the temporal proximity to support a finding of causation. *See* Doc. 26 at 49–59.  Moreover, Plaintiff's reliance on "use" of his accommodations as the basis for asserting retaliation is illogical and would create an open-ended perpetual ground for making claims whenever a disabled employee is dissatisfied with something in the workplace. Accordingly, Defendant's motion is due to be granted as to Plaintiff's claim of retaliation.

      D.    *Failure to Promote*

Plaintiff appears to allege that around December 2012, he was not selected for a promotion based on his disability and his requests for accommodations. (Doc. 1, ¶¶ 66-67).  As a preliminary matter, his claim for discrimination based on a failure to promote fails as there is no mention or suggestion of the failure to promote as a basis for his discrimination claims in his Charge. *See* Doc. 27-27.

Even if Defendant's motion is not granted due to Muttersbaugh's failure to exhaust his administrative remedies on this claim, his failure-to-promote claim will still fail as he cannot establish a *prima facie* case.  To prevail on a claim of failure to promote, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004).  Other than alleging he applied for a new position, but did not receive it, Muttersbaugh presents no evidence to demonstrate he was qualified for the other position.  Nor does he present evidence as to the qualification of the person selected for the position or any evidence that the promoted individual is outside his protected class. Moreover, Plaintiff's reliance on his cat's paw theory for his retaliatory failure to promote is even more tenuous. Accordingly, Defendant's motion is due to be granted on this claim.

## V.      CONCLUSION AND RECOMMENDATION

Accordingly, for the reasons stated it is **RECOMMENDED** that Defendant HMMA's Motion for Summary Judgment (Doc. 25) be **granted**.

## VI.     NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. Accordingly, it is hereby **ORDERED** that any objections to the Report and Recommendation shall be filed on or before **January 11, 2019**.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; see also 28 U.S.C. § 636(b)(1).

**Respectfully recommended** this 28th day of December 2018.


DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE